RENDERED: JANUARY 21, 2021
TO BE PUBLISHED

# Supreme Court of Kentucky

2018-SC-0478-DG

BRYAN KEITH SIMMS,                                                    APPELLANT
EXECUTOR OF THE ESTATE
OF JOHN ROBERT SIMMS


                         ON REVIEW FROM COURT OF APPEAL
                              NO: 2017-CA-0306-DG
V.                       SCOTT CIRCUIT COURT NO: 15-CI-0339


ESTATE OF BRANDON MICHAEL BLAKE;                                     APPELLEES
MELANIE GOSSER BLAKE, INDIVIDUALLY;
MELANIE GOSSER BLAKE, CO-
ADMINISTRATOR OF THE ESTATE OF
BRANDON MICHAEL BLAKE;
DEREK BLAKE, INDIVIDUALLY; AND
DEREK BLAKE, CO-ADMINISTRATOR OF
THE ESTATE OF BRANDON MICHAEL
BLAKE AND FRED PETERS


### OPINION OF THE COURT BY JUSTICE LAMBERT

### AFFIRMING


In this probate case, John Robert Simms,[1] challenges the trial court's

ruling that KRS[2] 391.033 and KRS 411.137 (together "Mandy Jo's Law")

precluded him from recovering his intestate share of the settlement proceeds

---

[1] John Robert Simms passed away on October 5, 2019. Bryan Keith Simms
was appointed his Executor on November 6, 2019. Bryan Keith Simms has been
substituted as Appellant in the pending appeal.

[2] Kentucky Revised Statutes.

connected with the wrongful death of his son, Brandon Michael Blake. Simms's assertions of error fall into three general categories. First, he asserts that the circuit court's failure to remove Appellees, Melanie and Derek Blake, as co-administrators of Brandon's estate tainted the ensuing proceedings. Second, Simms raises a number of procedural errors concerning the standard of proof, burden of proof, and the operation of the hearing. Finally, Simms asserts that he should have prevailed on the merits. On this final point, Simms raises two alternative arguments: (1) the trial court clearly erred when it found that he "willfully abandoned" Brandon or (2) Appellees are estopped from claiming abandonment because they asked him to stay away from Brandon.

We conclude that the trial court correctly interpreted and applied Mandy Jo's Law in this case. Thus, we affirm the Court of Appeals. Further, because the construction of Mandy Jo's Law is a matter of first impression in this Court, we provide guidance as to the proper procedure lower courts should follow in such cases going forward.

## I. FACTUAL BACKGROUND

This dispute arises from the death of Brandon Michael Blake. Brandon was born to John Robert Simms and Melanie Gosser (now Melanie Gosser Blake) in August 1989. John and Melanie were not married and never cohabitated. At the time of Brandon's birth, Simms was married to another

woman and did not take steps to establish a legal parental relationship with Brandon.[3]

From his birth until 1997, Brandon lived with Melanie in Louisville. And although Simms did not seek formal visitation, he did provide some amount of support to Melanie and spent time with Brandon on occasion.[4] Simms testified that he saw Brandon weekly when they both lived in Louisville and stated that they often rode bikes at local parks. Melanie, in contrast, testified that Simms rarely saw Brandon. Both parties agree that Brandon spent some amount of time with Simms's mother and that Simms purchased three presents for Brandon while they lived in Louisville.

In 1996, Simms and Melanie entered an agreed order in Jefferson Family Court establishing Simms's paternity. This order required Simms to pay $281 per month in child support until Brandon turned eighteen. The family court handwrote a notation on the order indicating that the county attorney did not object to direct payment because Simms had been supporting Brandon prior to the entry of the order. Both parties agree that Simms never fell into arrears on his support payments.

The following year, Melanie and Brandon moved to Scott County so that Melanie could be closer to her workplace in Georgetown. After the move,

---

[3] No father is listed on Brandon's initial birth certificate.

[4] The parties significantly dispute the amount of support Simms provided before 1994. Simms contends that he gave Melanie money whenever she asked for it and paid numerous living expenses. Melanie testified that he gave her a total of $300 during that period.

Simms's in-person interaction with Brandon effectively ceased. Both parties agree that Simms only saw Brandon twice between 1997 and Brandon's death in 2015. On one occasion, Simms took Brandon to swim at his brother's farm. On another, Simms, Melanie, and Brandon met briefly at a rest stop on the interstate so Simms could give Brandon a present.[5] Beyond these two events, Simms's contact with Brandon was limited to periodic exchanges of cards and gifts.

Shortly after moving to Georgetown, Melanie began dating Derek Blake. By 2000, Melanie and Derek married. At this point, Brandon took Derek's surname. On the petition for the name change, Melanie left the section requesting the name of the applicant's father blank. In the years after they married, Derek never sought to legally adopt Brandon.

On August 9, 2014, Brandon tragically died in an automobile accident. At the time of his death, Brandon was twenty-four years old and had neither a spouse nor children. Brandon did not leave a will. Shortly after his death, Melanie, and her husband, Derek Blake, filed a probate petition in Scott District Court seeking to be appointed co-administrators of Brandon's estate. On the petition, the Blakes listed Derek as Brandon's father and heir at law. The following day, Robert Simms, Brandon's natural father, contacted Melanie through counsel. Simms's counsel, Neal Herrington, informed Melanie's counsel, Fred Peters, that Simms was Brandon's natural father and that

---

[5] Melanie estimated that both of these visits occurred in 1998.

4

Simms intended to claim his portion of any wrongful death proceeds.[6]  Further, Simms's counsel told Mr. Peters that while "we may not ultimately contest the appointment" of Simms and Blake as co-administrators, he was concerned with their failure to notify Simms of the proceedings and requested that he be kept informed of the status of the wrongful death claim.

Throughout the next several months, Mr. Peters and Mr. Herrington exchanged several letters regarding the status of the claim.  Eventually, in February 2015, Mr. Peters informed Mr. Herrington that the parties had reached settlement agreements in the wrongful death case.  In the same letter, however, Mr. Peters stated that KRS 411.137 precluded Simms from claiming any portion of the proceeds because he had not been involved in Brandon's life in nearly two decades.

Shortly thereafter, Melanie filed an amended probate petition naming Simms as the natural father and herself as sole administrator.  Additionally, Melanie filed a motion seeking a hearing before the district court concerning Simms's claim to a portion of the wrongful death proceeds.  Simms objected and moved for the court to appoint a public administrator for the estate.  He alleged that Melanie made false statements to the court in order to deprive him

---

[6] Mr. Peters voluntarily withdrew as counsel for both the Estate and the Blakes while this case was before the trial court.  During the pendency of this litigation, Mr. Peters intervened in the litigation seeking payment of his fee.  The Scott Circuit Court's findings of facts and conclusions of law regarding Simms do not address the claims between Mr. Peters and the Estate.  As noted by the Court of Appeals, the circuit court complied with Kentucky Rule of Civil Procedure (CR) 54.02.  Thus, we have jurisdiction over the claims ruled on by the circuit court and leave any remaining claims to be properly adjudicated.

of his share of the proceeds and that such statements rendered her unfit to fairly administer the estate.[7]

Simms filed a separate civil action in circuit court against Brandon's estate and the Blakes, both in their individual capacity and as co administrators. The complaint alleged that the Blakes intentionally misrepresented Derek's relationship to Brandon in an attempt to divest Simms of his statutorily entitled portion of the wrongful death proceeds. As such, Simms asserted claims of breach of fiduciary duty, negligence, and fraud. In a subsequent motion, Simms further moved for the circuit court to remove Melanie and Derek as co-administrators of the estate. The Blakes and the estate filed an answer and counterclaim, arguing that Mandy Jo's Law precluded Simms's recovery of any portion of the settlement proceeds.[8]

The circuit court refused to remove Melanie and Derek as co-administrators because the appointment had occurred in the district court. Under the court's reasoning, the district court was best suited to determine that question. Further, the circuit court ruled that the Blakes's attorney, Richard Rawdon, could not continue to simultaneously represent Brandon's estate. As such, Attorney Joseph Wright began representing the estate.

---

[7] Simms filed a similar motion nearly one month later. This motion affirmatively requested that the district court remove Melanie and Blake as co-administrators.

[8] In response to the numerous motions filed in circuit court, the district court stayed further proceedings until the circuit court resolved of the motions before it.

A bench trial was held on August 8, 2016. The parties and the court agreed prior to trial that the estate bore the burden of proof in establishing that Mandy Jo's Law applied. At trial, however, the estate effectively played a passive role. The estate called various witnesses but then passed the witnesses to Melanie's individual counsel for questioning. Ultimately, the court concluded that Mandy Jo's Law foreclosed Simms from receiving any distribution of funds from the estate or any amount of the wrongful death proceeds.

A divided panel of the Court of Appeals affirmed the trial court's judgment. The majority concluded that the trial court correctly applied KRS 411.137 and held that it barred Simms from recovering any amount of the wrongful death settlement. This Court granted discretionary review.

## II. ANALYSIS

### A. Mandy Jo's Law and the related statutory framework.

Mandy Jo's Law, codified in both KRS 411.137 and 391.033, limits the ability of a parent who has forgone participation in the child's care and upbringing from enriching themselves in the event that their child predeceases them. Collectively, the statutes prevent a parent who has "willfully abandoned the care and maintenance of his or her child" from maintaining a wrongful death action for that child, from administering the child's estate, or from inheriting any part of the child's estate through intestate succession. KRS 411.137 provides in pertinent part:

> (1) A parent who has willfully abandoned the care and maintenance of his or her child shall not have a right to maintain a

7

wrongful death action for that child and shall not have a right otherwise to recover for the wrongful death of that child, unless:

(a) The abandoning parent had resumed the care and maintenance at least one (1) year prior to the death of the child and had continued the care and maintenance until the child's death, or

(b) The parent had been deprived of the custody of his or her child under an order of a court of competent jurisdiction and the parent had substantially complied with all orders of the court requiring contribution to the support of the child.

KRS 391.033, in substantially similar language, limits the parent's right to administer the child's estate and right to intestate succession.

Mandy Jo's Law disrupts the usual operation of both probate proceedings and wrongful death proceedings. Ordinarily, when a person dies intestate, the provisions of KRS Chapters 391 and 392 govern the descent of their property. Subject to the rights of a surviving spouse, the statutory scheme favors the decedent's children, followed by their parents, followed by any siblings.[9] Mandy Jo's Law removes a parent determined to have willfully abandoned their child from the statutory calculation; it cancels out that parent's statutory right of intestate succession.[10]

A related but distinct statute governs a parent's right to maintain a wrongful death action. Though the wrongful death cause of action is constitutional in nature, the Kentucky Constitution explicitly leaves the details

---

[9] *See* KRS 391.010; KRS 391.030.

[10] KRS 391.033(2) ("Any part of a decedent child's estate prevented from passing to a parent … shall pass through intestate succession as if that parent has failed to survive the decedent child.").

8

to the discretion of the General Assembly.[11]  Under the statutory framework,

the personal representative of the decedent's estate brings a wrongful death

claim on behalf of the "kindred of the deceased."  KRS 411.130 defines the

classes of beneficiaries and sets the order of distribution.  As is relevant here, if

the decedent leaves no surviving spouse or children, any damages recovered

pass in equal shares to the decedent's father and mother.  Importantly, this

process—though shepherded by the personal representative—is separate from

the probate proceeding.  Only if the decedent leaves no spouse, child, parents,

or siblings does the recovery become a part of the estate.[12]  In short, Mandy

Jo's Law serves as a narrow exception to two similar, but ultimately separate,

statutory processes.

**B. The trial court's failure to remove Melanie and Derek Blake as administrators of the estate was harmless error.**

Simms first argues that the trial court erred when it refused to remove

Melanie and Derek as co-administrators of Brandon's estate due to their prior

false statements regarding Derek's relation to Brandon and their adverse legal

position to Simms.  In essence, Simms argues that the Blakes' dual role as

individual litigants and co-administrators of the estate impermissibly tainted

the proceedings, led to harmful procedural errors, and shifted the burden of

proof.

---

[11] *See* Ky. Const. § 241.

[12] KRS 411.130(e).

9

A district court may remove the personal representative of an estate where the personal representative, among other prescribed circumstances, is "otherwise incapable to discharge the trust."[13]  Generally, this provision requires that a personal representative act in good faith and perform his or her duties in a fair and unbiased manner.[14]  We have interpreted this language as requiring removal in circumstances where the personal representative "assumes an adverse or antagonistic position" to the estate or its possible beneficiaries.[15]  Similarly, removal is warranted when an administrator surreptitiously attempts to gain more of the estate than he or she is entitled to.[16]

Removal was clearly warranted in this case.  At the very least, the Blakes and Simms adopted adverse legal positions regarding Simms's right to intestate succession.  The Blakes' claim, if successful, necessarily diminishes Simms's inheritance and increases their own.  That is a sufficient conflict of interest to justify their removal as administrators.  Yet this conclusion does not foreclose our consideration of the issue: we must determine if this warrants a remedy.  In our view, the time in which the appointment of an impartial administrator would be useful has passed.

---

[13] KRS 395.160.

[14] *Karsner's Ex'r v. Monterey Christian Church,* 200 S.W.2d 474 (Ky. 1947).

[15] *Price's Adm'r v. Price,* 163 S.W.2d 463 (Ky. 1942); *see also Mullins v. Mullins,* 212 S.W.2d 272 (Ky. 1948).

[16] *Zinn's Adm'r v. Brown,* 10 S.W.2d 300 (Ky. 1928).

As the Court of Appeals correctly noted, the role of the administrator regarding the wrongful death settlement proceeds effectively ended after the settlement agreements were reached. Under KRS 411.130, the personal representative only prosecutes the action for the beneficiaries; the proceeds are not added to the probate estate unless there are no living beneficiaries as noted herein under the statutes. Thus, by the time that Simms challenged the appointment of the Blakes before the district court, their role as it pertains to the wrongful death proceeds had effectively ceased. The funds remained in escrow. All that remained was for Melanie and Simms to litigate the Mandy Jo's Law issue in their individual capacities.

Simms argues that the Blakes' dual role affected the burden of proof and presentation of evidence at trial. Broadly, Simms contends that allowing the estate to take a passive role during the bench trial improperly shifted the burden of proof to Melanie. This argument ignores, however, that a beneficiary's entitlement to wrongful death proceeds stems from a different source than the probate statutes. The right to recover for wrongful death—guaranteed under § 241 of the Kentucky Constitution and codified in KRS 411.130—belonged to Melanie and Simms in their individual capacities. In this way, the burden of proof was properly Melanie's in the first instance. Thus, Melanie's dual role did not cause irreparable procedural error before the trial court.

At bottom, we agree with the Court of Appeals that remanding this case for the appointment of a new administrator would not meaningfully change the

11

result. We emphasize that this conclusion depends on the specific facts and circumstances of this case. It is essential that the administration of a probate estate be carried out in a fair and impartial manner and without deceit. In many cases, the failure to remove an improper administrator will constitute reversible error. But in this case, that failure did not lead to an injustice.[17]

**C. The trial court correctly employed the preponderance of the evidence standard of proof.**

Simms next contends that the trial court erred in applying a preponderance of the evidence standard of proof. The statute is silent as to the standard of proof. Simms asserts that the court should have applied the "clear and convincing standard" because Mandy Jo's Law implicates parental rights. The applicable standard of proof is a question of law and is subject to de novo review.[18]

The question of what standard of proof applies is ultimately a matter of due process. The purpose of "a standard of proof, as the concept is embodied in the Due Process Clause and in the realm of fact-finding, is to instruct the factfinder concerning the degree of confidence our society thinks he should

---

[17] *See* CR 61.01, which states:

No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

[18] *See Morton v. Tipton*, 569 S.W.3d 388, 396 (Ky. 2019).

have in the correctness of factual conclusions for a particular type of adjudication."[19] The applicable standard of proof is determined by reference to the "risk of error inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions."[20] In the typical civil action, "proof by a preponderance of the evidence normally determines the rights of the parties."[21] In circumstances, where the individual interests at stake in a state proceeding are "particularly important" and "more substantial than mere loss of money," application of the higher clear-and-convincing evidence standard is proper.[22] "Whether the loss threatened by a particular type of proceeding is sufficiently grave to warrant more than average certainty on the part of the factfinder turns on both the nature of the private interest threatened and the permanency of the threatened loss."[23]

Based on the recognition that the care and custody of one's child is a fundamental right, termination of parental rights proceedings must utilize a clear and convincing evidence standard of proof.[24] Simms argues that Mandy Jo's Law is in effect a posthumous declaration of parental rights and, as such, should similarly require a heightened standard of proof. We disagree.

---

[19] *Santosky v. Kramer*, 455 U.S. 745, 754-55 (1982) (quoting *Addington v. Texas*, 441 U.S. 418 (1979)(internal quotation marks and citations omitted)).

[20] *Id.* at 757 (quoting *Matthews v. Eldridge*, 424 U.S. 319 (1976)).

[21] *Woods v. Commonwealth*, 142 S.W.3d 24, 43 (Ky. 2004).

[22] *Addington*, 441 U.S. at 424.

[23] *Santosky*, 455 U.S. at 758.

[24] *See id.*; *see also Cabinet for Human Res. v. E.S.*, 730 S.W.2d 929 (Ky. 1987).

Unlike a parent's right to the care and custody in their children, the question of who shall inherit what is firmly a legislative one.[25]  Though this legislative power is limited by constitutional provisions, a person does not have a constitutional right to an inheritance.  Similarly, while the Kentucky Constitution guarantees the right of kin to maintain a wrongful death cause of action, it simultaneously empowers the General Assembly to define the parameters of that right.[26]  The right to the care and custody of one's child is quite different: it is independently protected as a fundamental right.  Thus, Mandy Jo's Law does not infringe on a parent's constitutional rights.  Rather, it is a statute that alters and limits other *statutory rights*.

Moreover, both the wrongful death and intestate succession statutes deal with property rights.  It is of course true that resolving a deceased relative's affairs or holding culpable parties accountable for their actions provides emotional or spiritual benefits to their surviving loved ones.  Yet, it is undeniable that both statutes primarily concern the distribution of property, specifically money.

Other jurisdictions with similar statutes have reached similar conclusions.  For instance, North Carolina, which has a nearly identical statute

---

[25] *See, e.g., Woods v. Crump*, 142 S.W.2d 680 (Ky. 1940) ("[I]t is acknowledged by all that it is competent for the legislative branch of the sovereignty of a state to prescribe who may inherit the property of a deceased individual dying intestate by appropriately enacted statutes of Descent and Distribution.")).

[26] *See* Ky. Const. § 241.

to Mandy Jo's Law,[27] employs a preponderance of the evidence standard.[28] Similarly, the legislatures of both Ohio and South Carolina specify in the statute that a preponderance standard must be used to determine abandonment.[29]

In light of the foregoing, we conclude that the rights at stake in a case arising under Mandy Jo's Law do not warrant a heightened standard of proof. Accordingly, we hold that in future cases trial courts must use the preponderance of the evidence standard when considering claims under Mandy Jo's Law.

**D. The trial court did not clearly err in finding that Simms willfully abandoned Brandon.**

Both KRS 391.033 and KRS 411.137 require the trial court to find that a parent "willfully abandoned" their child. The trial court found that Simms willfully abandoned Brandon, in spite of his continued child support payments, because he chose to forego significant personal contact for roughly fifteen years. We review findings of fact for clear error.[30] A factual finding is not

---

[27] N.C. Gen. Stat. Ann. § 31A-2.

[28] *See In re Estate of Lunsford*, 610 S.E.2d 366, 370 (N.C. 2005) (distinguishing termination of parental rights proceedings from actions brought under § 31A-2 due to the heightened standard of proof required in the former). *But see New Jersey Div. of Youth & Family Servs. v. M.W.,* 398 N.J. Super. 266, 942 A.2d 1 (App. Div. 2007) (employing clear and convincing evidence standard and holding that family court had the authority to retroactively terminate mother's parental rights to deceased child and extinguish her right to inheritance on equitable grounds).

[29] Ohio Rev. Code Ann. §2105.10 ("The administrator has the burden of proving, by a preponderance of the evidence that the parent abandoned the child."); S.C. Code Ann. §62-2-114 ("[I]f the court determines, by a preponderance of the evidence, that the parent or parents failed to reasonably provide support for the decedent ...").

[30] CR. 52.01.

15

clearly erroneous if it is supported by "evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable men."[31]

In *Kimbler v. Arms,* the Court of Appeals issued the only published decision interpreting Mandy Jo's law in Kentucky.[32] *Kimbler* concerned a father who was in arrearages on child support, did not know the last grade level the child completed, and did not contribute towards the child's funeral. Following the settlement of their child's wrongful death claim, the mother sought a declaratory judgment that Mandy Jo's Law disqualified the father from recovering a portion of the settlement proceeds.[33] The court defined "abandon" as "neglect and refusal to perform natural and legal obligations to care and support, withholding of parental care, presence, opportunity to display voluntary affection and neglect to lend support and maintenance … it means also the failure to fulfill responsibility of care, training, and guidance during the child's formative years."[34] Importantly, the court emphasized that monetary support alone is only a factor in determining abandonment; courts must also consider the nature of the parent's involvement in their child's upbringing.[35]

---

[31] *Owens-Corning Fiberglass Corp. v. Golightly*, 976 S.W.2d 409, 414 (Ky. 1998).

[32] 102 S.W.3d 517 (Ky. App. 2003).

[33] *Id*. at 521-522.

[34] *Id*. at 525.

[35] *Id*. at 525.

Based on our review of the relevant law, we conclude that *Kimbler* sets out a correct analysis of Mandy Jo's Law and adopt its holding. As the Court of Appeals correctly noted below, there is no bright-line rule for abandonment. Instead, a court must assess the facts and circumstances of the case at hand to determine if the parent's conduct demonstrated an intent to both support the child monetarily and care for the child as a parent.[36] While payment of support is relevant, standing alone it is insufficient to preclude a finding of abandonment.

Here, it is undisputed that Simms paid child support for nearly eleven years and never fell into arrears. Additionally, both parties agree that Simms saw Brandon more frequently when he and Melanie both lived in Louisville. And neither party disputes that Simms had not seen Brandon in person within fifteen years of his death. Otherwise, the parties disagree significantly regarding Simms's involvement in Brandon's life. Under Simms's account, he regularly saw Brandon when they lived in Louisville, agreed not to visit with Brandon at Melanie's request once they moved to Scott County, but maintained correspondence with Brandon through gifts and letters.[37] According to Melanie, Simms sent a handful of cards and presents to Brandon shortly after

---

[36] This approach follows our lower courts' definition of abandonment in the termination of parental rights context. *See, e.g.*, *S.B.B. v. J.W.B.,* 304 S.W.3d 712 (Ky. App. 2010); *J.H. v. Cabinet for Human Res,* 704 S.W.2d 661, 663 (Ky. App. 1985); *O.S. v. C.F.,* 655 S.W.2d 32, 34 (Ky. App. 1983).

[37] One of Brandon's close friends testified that Simms sent Brandon a book that he had authored while Brandon lived in Scott County. Additionally, Simms produced numerous cards containing Brandon's handwriting that he received throughout the years.

the family moved out of Louisville, but otherwise had not spoken to him in years.

On the basis of the record before us and in light of the trial court's role as factfinder, we conclude that the trial court did not clearly err in finding that Simms willfully abandoned Brandon. While Simms maintained his support payments, *Kimbler* makes clear that support is only one factor to be considered. Both parties admit that Simms had not seen Brandon nor had significant interaction between 1998 and 2014. Moreover, at no time did Simms seek visitation, formally or informally, with Brandon. Insofar as Simms and Melanie offer opposing testimony concerning Simms's efforts to be involved in Brandon's life, credibility determinations are best left to the finder of fact. In sum, a reasonable person could conclude, on the basis of the evidence presented, that Simms played a relatively non-existent role in Brandon's life. We find that the trial court did not err in finding that Simms willfully abandoned Brandon.[38]

**E. Equitable Estoppel does not preclude Melanie from raising Mandy Jo's Law as a defense.**

Finally, Simms asserts that the doctrine of equitable estoppel should bar Melanie from claiming abandonment because she asked Simms to stay away

---

[38] Simms asserts that KRS 411.137(1)(b) permits him to recover under the wrongful death statute. That statute provides an exception to the general prohibition in Mandy Jo's Law when the parent lost custody pursuant to a court order but complied with all court orders regarding support. Simms attempts to take the benefit of the second part of the exception while ignoring the first. While it is true that he complied with the court order requiring him to contribute to Brandon's support, he was not deprived of custody via a court order. Thus, KRS 411.137(1)(b) is inapplicable.

from Brandon and herself. Although Simms claims that the Court of Appeals mistakenly conflated the doctrines of equitable estoppel and misrepresentation, we hold the Court of Appeals analysis to be correct.

The *Fluke Corp.* case sets out the elements of equitable estoppel in Kentucky:

> The essential elements of equitable estoppel are: (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts. And, broadly speaking, as related to the party claiming the estoppel, the essential elements are (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (3) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice.[39]

Here, Simms claims that Melanie's requests for Simms to stay away from Brandon induced Simms to forfeit his rights to recovery. This claim fails to demonstrate how Melanie's requests induced him to forego a relationship with his son, especially as Brandon had reached the age of majority and was not under the custody and control of Melanie for several years until his death. Simms fails to show that Melanie concealed, failed to divulge, or framed her conduct in any way to mislead Simms. Assuming that Melanie did ask him to stay away, Simms knew that he was Brandon's biological father and knew that

---

[39] *Fluke Corp. v. LeMaster,* 306 S.W.3d 55, 62 (Ky. 2010).

he could petition the court for visitation if he desired, even over Melanie's objection. As such, we conclude that Simms cannot establish the elements of an equitable estoppel claim.

## III. CONCLUSION

In light of our review of the record and applicable law, we affirm.

Minton, C.J.; Conley, Hughes, Keller, Lambert, and VanMeter, JJ.; sitting. Nickell, J., not sitting. Minton, C.J., Conley, Hughes, Keller, Lambert and VanMeter, JJ., concur.


COUNSEL FOR APPELLANT:

A. Neal Herrington
Christopher H. Morris
HARGANDON, LENIHAN & HERRINGTON, PLLC
Louisville, KY

COUNSEL FOR APPELLEES:

Joseph A. Wright
Georgetown, Kentucky
Counsel for the Estate of Brandon Michael Blake


Richard Rawdon, Jr.
Georgetown, Kentucky
Counsel for Derek and Melanie Blake


Fred E. Peters
Rhey Denniston Mills
Lexington, Kentucky